# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

DANIEL ANTHONY BRADY,              )
     Plaintiff,                          )
                             )
     v.                                  )     CAUSE NO.: 2:16-CV-523-PRC
                             )
NANCY A. BERRYHILL,                )
Acting Commissioner of the        )
Social Security Administration,   )
     Defendant.                          )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Daniel Anthony Brady on December 19, 2016, and a Plaintiff's Brief in Support of Reversing the Decision of the Commissioner of Social Security [DE 13], filed on June 13, 2017. Plaintiff requests that the September 19, 2015 decision of the Administrative Law Judge denying his claim for supplemental security income be reversed and remanded for further proceedings. On August 24, 2017, the Commissioner filed a response, and Plaintiff filed a reply on October 13, 2017. For the following reasons, the Court grants Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for supplemental security income on June 27, 2013, after he turned eighteen years old, alleging disability since birth in 1995 based on trisomy 20 mosaicism, pulmonary stenosis, occult cleft palate, and severe scoliosis. The claim was denied initially and on reconsideration. On September 2, 2015, Administrative Law Judge Laurie Wardell ("ALJ") held a hearing. In attendance at the hearing were Plaintiff, Plaintiff's family, Plaintiff's attorney, and an impartial vocational expert. On September 19, 2015, the ALJ issued a written decision denying benefits, making the following findings:

1.      The claimant has not engaged in substantial gainful activity since June 27, 2013, the application date.

2.      The claimant has the following severe impairments: scoliosis, learning disability, and mild pulmonary valve stenosis.

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can occasionally lift and carry 20 pound[s] and frequently 10 pounds; sit for 6 hours and stand for 6 hours; is able to occasionally be exposed to extreme cold, extreme heat, wetness, humidity, fumes, odors and pulmonary irritants; and is able to do simple routine repetitive tasks not at a production rate pace. The claimant is not able to do work that requires writing with a writing instrument. The claimant should have no exposure to hazards. The claimant is limited to occasional fingering and work in a work environment that is not any louder than a moderate work environment.

5.      The claimant has no past relevant work.

6.      The claimant was born [in 1995] and was 18 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7.      The claimant has at least a high school education and is able to communicate in English.

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.     The claimant has not been under a disability, as defined in the Social Security Act, from June 27, 2013, the date the application was filed.

(AR 13-22).

The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481. Plaintiff filed this civil action pursuant to 42 U.S.C. § 405(g) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and

the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate her analysis of the evidence in order to allow the reviewing court to trace the path of her reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that [a reviewing court] may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and [her] conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be

expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. § 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. § 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If no, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if no, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's residual functional capacity (RFC), age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's RFC. The RFC "is an administrative assessment of what work-related activities an individual can perform despite [his] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R.

§ 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 885-86; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff seeks reversal and an award of benefits or, in the alternative, remand for further proceedings, arguing that the ALJ failed to properly analyze the Listings at step three, that the RFC assessment was not supported by substantial evidence, and that the credibility determination of Plaintiff's and his parents' testimony was legally insufficient. The Court considers each argument in turn.

### A. Listing of Impairments

The ALJ found that Plaintiff does not meet or equal a listing at step three of the sequential analysis. On June 26, 2013, Plaintiff's treating physician, Dr. C. Kramer, authored a letter to the Social Security Administration Office of Disability Adjudication and Review. (AR 313). At the time of the letter, Plaintiff was already eighteen years old. In the letter, Dr. Kramer, who indicated he had been treating Plaintiff since August 2001, identified Plaintiff's diagnoses as velopharyngeal insufficiency, which required multiple surgeries; a submucus cleft palate; pulmonary artery stenosis; a learning disability; and a seizure disorder. *Id*. Dr. Kramer wrote that, in March 2002, Plaintiff was evaluated at the Genetic Clinic of Children's Memorial Hospital and found to have trisomy 20 mosaicism on a chromosomal analysis. *Id*. He explained that this diagnosis unified all of Plaintiff's problems under one diagnosis. *Id*. Dr. Kramer then opined: "The diagnosis of Trisomy 20 mosaicism with all of Daniel's concurrent problems would appear to medically meet listing 110.8B." *Id*. The Court notes that there is no Listing 110.8B, but Dr. Kramer likely intended to identify Listing

110.08B for "catastrophic congenital disorders," discussed below. On August 25, 2015, Dr. Kramer authored a second letter giving the same background information and diagnoses but offering no opinion on whether Plaintiff meets or equals a listing. (AR 610).

The Listing of Impairments for the evaluation of impairments of children under age 18 is found in Appendix 1, Part B. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part B. The introductory sentence to Part B provides: "Medical criteria for the evaluation of impairments of children under age 18 (where criteria in part A do not give appropriate consideration to the particular disease process in childhood)." *Id*. The listings in Part B are "never" used to evaluate individuals who are age eighteen or older. 20 C.F.R. § 416.925(b)(2)(I). Within Part B, Listing 110.00 addresses "Congenital Disorders That Affect Multiple Body Systems." This section evaluates two impairments: "non-mosaic Down syndrome and catastrophic congenital disorders." *Id*. at § 110.00A.

First, Listing 110.06 addresses non-mosaic Down syndrome, which is defined under the Listing as a genetic disorder involving extra copies of chromosome 21 in all of the cells, identified as either "chromosome 21 trisomy" or "chromosome 21 translocation." *Id*. at § 110.00B. There are no medical records showing that Plaintiff has chromosome 21 trisomy or chromosome 21 translocation. Rather, Plaintiff was diagnosed with trisomy 20 mosaicism. (AR 281).

Second, Listing 110.08, the listing identified by Dr. Kramer, addresses "catastrophic congenital disorders":

> 110.08 A catastrophic congenital disorder (see 110.00D and 110.00E) with:
> A. Death usually expected within the first months of life, or
> B. Very serious interference with development or functioning.

*Id*. at § 110.08. For purposes of Listing 110.08, a catastrophic congenital disorder includes, but is not limited to, anencephaly, cyclopia, chromosome 13 trisomy (Patau syndrome or trisomy D), and

chromosome 18 trisomy (Edwards' syndrome or trisomy E), which are usually expected to result in early death. *Id*. at § 110.00D. Other disorders include cri du chat syndrome (chromosome 5p deletion syndrome) and the infantile onset form of Tay-Sachs disease, which interfere "very seriously with development." *Id*. Pursuant to Listing 110.00D, the term "very seriously" in 110.08 has the same definition as the term "extreme" in § 416.926a(e)(3), which provides, in part: "We will find that you have an 'extreme' limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3). "'Extreme' limitation also means a limitation that is 'more than marked.' 'Extreme' limitation is the rating we give to the worst limitations. However, 'extreme limitation' does not necessarily mean a total lack or loss of ability to function." *Id*.

Separately, the Listing of Impairments for Adults is found in Part A, and Listing 10.00 is titled "Congenital Disorders that Affect Multiple Body Systems." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A, § 10.00. Listing 10.00A provides that, "[a]lthough Down syndrome exists in non-mosaic and mosaic forms, we evaluate only non-mosaic Down syndrome under this body system." *Id*. at § 10.00A. Listing 10.00B, for adults, defines non-mosaic Down syndrome in the same manner as it is defined in Listing 110.06 for children. *See id*. at § 10.00B. Again, Plaintiff was not diagnosed with chromosome 21 trisomy or chromosome 21 translocation, also required for adult Listing 10.00.

Listing 10.00D addresses how to evaluate "mosaic Down syndrome and other congenital disorders that affect multiple body systems." *Id*. at § 10.00D. In his reply brief, Plaintiff contends that trisomy 20 falls under mosaic Down syndrome. (ECF 21, p. 9). However, like non-mosaic Down syndrome, mosaic Down syndrome implicates extra copies of chromosome 21, and there is no evidence that Plaintiff was diagnosed with extra copies of chromosome 21. *See* 10.00D1.

Nevertheless, it appears that Plaintiff may be arguing that he falls under the category of "other congenital disorders that affect multiple body systems," set out in Listing 10.00D2, which provides:

> Other congenital disorders, such as congenital anomalies, chromosomal disorders, dysmorphic syndromes, inborn metabolic syndromes, and perinatal infectious diseases, can cause deviation from, or interruption of, the normal function of the body or can interfere with development. Examples of these disorders include both the juvenile and late-onset forms of Tay-Sachs disease, trisomy X syndrome (XXX syndrome), fragile X syndrome, phenylketonuria (PKU), caudal regression syndrome, and fetal alcohol syndrome. For these disorders and other disorders like them, the degree of deviation, interruption, or interference, as well as the resulting functional limitations and their progression, may vary widely from person to person and may affect different body systems.

*Id.* at § 10.00D2. Listing 10.00D3 then explains how to evaluate the effects of these congenital disorders under the listings:

> When the effects of mosaic Down syndrome *or another congenital disorder* that affects multiple body systems are sufficiently severe *we evaluate the disorder under the appropriate affected body system(s), such as musculoskeletal, special senses and speech, neurological, or mental disorders*. Otherwise, we evaluate the specific functional limitations that result from the disorder under our other rules described in 10.00E.

*Id.* at § 10.00D2 (emphasis added). Finally, 10.00E provides that, if the disorder does not meet or equal a listing, then the claimant's residual functional capacity will be assessed and the Commissioner will proceed to the fourth and, if necessary, fifth steps of the sequential analysis. *Id.* at § 10.00E.

In her decision, the ALJ gave no weight to Dr. Kramer's June 2013 opinion that Plaintiff meets the childhood criteria for "110.[0]8B." (AR 14). The ALJ commented that the doctor did not appear to be familiar with the criteria of the Listing. *Id.* The ALJ noted that Plaintiff was not a child at the time that he applied for benefits or at the time of the ALJ's decision. *Id.* Then, the ALJ considered whether Dr. Kramer's finding would apply to the comparable adult listing, which is

Listing 10.00, writing: "Further, the claimant was not diagnosed with trisomy 21 or Down Syndrome and there is no karyotype analysis documenting non-mosaic Down Syndrome, which would be required for Listing 110B or the comparable adult listing 10.00. Moreover, there is evidence of functioning inconsistent with such a diagnosis." *Id*. Although the ALJ did not specifically reference Listings 10.00D2 and 10.00D3, the ALJ nevertheless considered the listings for the appropriate affected body systems, finding that Plaintiff's impairments do not meet or equal the listings for musculoskeletal (1.04), respiratory (3.09), cardiovascular (4.06), and mental (12.02).

In her brief, Plaintiff argues that the ALJ did not consider "whether an adult listing, comparable to childhood listing 110.08B was met or equaled." (ECF 13, p. 17). Plaintiff misunderstands the ALJ's decision. Although child Listing 110.06 has its equivalent in adult Listing 10.06, there is no comparable adult listing for child Listing 110.08; instead, it appears that Plaintiff's impairments are considered under "other congenital disorders" as explained in 10.00D. The ALJ discussed trisomy 21 and Down Syndrome because such a diagnosis is required to meet adult Listing 10.00, which the ALJ found Plaintiff did not meet.

As set forth above, Listings 10.00D2 and 10.00D3 provide that, when other congenital disorders are at issue, the disorder is evaluated under the affected body systems. In order to meet or equal a listing, the claimant must satisfy all of the criteria of a given listing. *See* 20 C.F.R. §§ 416.925, 416.926; *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004). The ALJ considered Listings 1.04, 3.09, 4.06, and 12.02, which are listings that correlate with Plaintiff's affected body systems, and the ALJ found that the listings were not met. Plaintiff does not appear to contest the ALJ's decision as to Listings 1.04, 3.09, and 4.06. Plaintiff only disputes the ALJ's assessment of the listings for mental impairments, arguing that the ALJ's consideration of Listing 12.02 for

neurocognitive disorders was "perfunctory" and that the ALJ should have considered Listing 12.05 for intellectual disorders and Listing 12.11 for neurodevelopmental disorders. (ECF 13, p. 18).

As to Listing 12.02, the ALJ conducted a thorough analysis of the A and B paragraph criteria and relied on the opinion of state agency psychological consultant Dr. Grange, to which the ALJ gave great weight. Plaintiff does not acknowledge this analysis of Listing 12.02. Moreover, Plaintiff does not identify any evidence to show that he meets Listing 12.02. As for Listing 12.05 for intellectual disorders or Listing 12.11 for neurodevelopmental disorders, Plaintiff neither lists the required criteria nor identifies any objective evidence demonstrating that he would meet or equal those Listings. *See* App'x P, Subpart P, Part A, § 12.00C ("We need objective medical evidence from an acceptable medical source to establish that you have a medically determinable mental disorder."). The ALJ did not err in finding that Dr. Kramer's opinion regarding 110.08B did not translate to the adult listings.

Finally, Plaintiff argues that the ALJ should have re-contacted Dr. Kramer to ask whether he believed that Plaintiff's impairments meet or equal the criteria for the adult listing. But, as set forth above, there is no equivalent adult listing to child listing 110.08B and the ALJ conducted a proper analysis of whether Plaintiff's congenital disorder meets or equals the listings for the appropriate affected body systems, relying on the opinion of Dr. Grange. Plaintiff has not identified any "new evidence" that would support finding that his congenital disorder meets or equals a listing, which would require the services of a medical expert. *See* (ECF 13, p. 19 (citing SSR 96-6p)). Therefore, it was unnecessary for the ALJ to re-contact Dr. Kramer or engage a medical expert at step three. Remand is not required as to the listing analysis at step three.

## B. Residual Functional Capacity

The Residual Functional Capacity ("RFC") is a measure of what an individual can do despite the limitations imposed by his impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. § 416.945(a). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. § 416.927(e)(1); *Diaz*, 55 F.3d at 306 n.2. The RFC is an issue at steps four and five of the sequential evaluation process and must be supported by substantial evidence. SSR 96-8p, 1996 WL 374184, *3 (July 2, 1996); *Clifford*, 227 F.3d at 870.

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing' basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p at *1. "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, at *3. The relevant evidence includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. *Id*. at *5. In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id*. The "ALJ must also consider the combined effects of all the claimant's impairments, even those that would not be considered severe in isolation." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *see also Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003).

Plaintiff argues that the ALJ's RFC assessment was not supported by substantial evidence in relation to his ability to walk, his ability to stoop, the effect of his migraines, the use of his hands,

his learning disability, and his speech. The Court considers each argument in turn, beginning with Plaintiff's migraine headaches because remand is required for proper consideration of the limiting effects of the migraines on his ability to work on a regular and continuing basis.

1.    *Migraines*

Plaintiff frequently reported migraines or headaches to his treating physicians. *See* (AR 321 (10/13/09); 323 (9/10/08) (four migraines since school started, with vomiting; falls asleep and three hours later the migraine is gone but he is very tired); 325 (2/20/2008) (headache noted); 329 (2/2/2007); 335 (9/14/2005); 337 (12/29/2003); 344 (8/28/2002); 352 (2/23/2007) (MRI for diagnosis of headaches); 578 (4/1/2014 - chief complaint is cough, sore throat, and fever with migraine headache noted as an active problem); 583 (2/6/2014 - "getting headaches weekly and mom wants to restart Periactin if needed"). In 2009, Periactin was controlling his migraines. (AR 321). The February 6, 2014 treatment record reports that Plaintiff's migraine headaches had recurred three weeks earlier, occurring about once a week. (AR 583). The doctor noted that Plaintiff takes two Motrin and takes a nap to resolve the headaches. *Id*. Plaintiff vomited with the migraines. *Id*.

At the time of the hearing, Plaintiff was having migraine headaches once a week and managed them with Ibuprofen and sleeping for one and a half hours. (AR 39). Plaintiff's father testified that Plaintiff gets headaches when he is given too much to do or when he is engaged in an activity for too long. (AR 65). Plaintiff's father also testified that Plaintiff vomits once he gets a headache. *Id*. His father testified that when Plaintiff was working as a bagger at a grocery store, Plaintiff would get sent home from work early because he would get a migraine and throw up. (AR 60). On a form he filled out on July 21, 2013, Plaintiff reported that his migraine headaches cause vomiting. (AR 222). On February 2, 2007, September 10, 2008, and February 6, 2014, Plaintiff

reported to his doctors that he would vomit when he has a headache. (AR 323, 329, 583). At times, Plaintiff was prescribed medication for his migraines. *See* (AR 222, 304) (Periactin). Plaintiff had a brain MRI on February 23, 2007, because of his migraines. (AR 352). The impression of the MRI provided:

1.    Diminution of the basilar angle suggestive of platybasia.
2.    Basilar invagination as described in the body of the report. The dens abuts the ventral surface of the brainstem. This contributes to crowding of the structures of the foramen magnum region. The brainstem also appears to be somewhat compressed in the vicinity of the cervicomedullary junction. Osteogenesis imperfecta has been known to present in this fashion. Other related osteochondrodysplasias are also possible. Please correlate clinically.

*Id.*

After acknowledging Plaintiff's allegation of "a history of stress related headaches" and Plaintiff's testimony that "he has headaches about once a week and he takes his mediation or sleeps to get rid of them," (AR 16), the only discussion by the ALJ of Plaintiff's headaches is in the context of the credibility determination, in which the ALJ wrote: "The claimant's pain and headaches have responded to the most conservative treatment, including over the counter medication." (AR 18). However, the ALJ did not discuss any of the longitudinal medical records regarding Plaintiff's complaints of headaches or his history of treating with prescription medication. The ALJ did not discuss Plaintiff's father's testimony that Plaintiff's headaches arose when "he was given too much to do, or engaged in an activity for too long," nor did the ALJ discuss Plaintiff's father's testimony regarding work stress causing the onset of the headaches, supported by examples from Plaintiff's prior work as a bagger at a grocery store. (AR 65). The ALJ did not discuss Plaintiff's MRI, which the Plaintiff's attorney brought to the ALJ's attention at the hearing in the context of discussing Plaintiff's headaches. (AR 34).

More importantly, the ALJ did not discuss the record testimony regarding Plaintiff's need to nap in order to resolve his headaches. The ALJ gave "some weight" to the testimony of Plaintiff's father, and recognized that it "offered insight into the severity of the claimant's impairment and how it affects his ability to function." (AR 20). Yet, the ALJ did not acknowledge or discuss this specific testimony, which is consistent with the longitudinal medical records, and how it would affect Plaintiff's ability to work. Even though Plaintiff's headaches were treated with over-the-counter medications at the time of the hearing, he nevertheless experienced them once per week, requiring that he sleep to alleviate the pain.

The Commissioner argues that the ALJ limited Plaintiff not only to simple, routine, and repetitive tasks but also to work that was not at a "production rate pace," which the Commissioner reasons removed the primary cause of Plaintiff's headaches—stress. However, the ALJ did not indicate that this limit to not a "production rate pace" was to accommodate Plaintiff's headaches; in the decision, the ALJ indicates only that the headaches are controlled with over-the-counter medication. There is no indication in the record that a reduction in pace would alleviate Plaintiff's stress. And, Plaintiff's headaches were brought on not only by stress but also by engaging in activity for too long, which is not accommodated by a reduction in pace.

The ALJ's failure to discuss Plaintiff's history of headaches, the brain MRI, and the consistent reports regarding the limiting effects of the headaches on Plaintiff's ability to perform basic work-related tasks, such as remaining at work for the entire shift, requires remand. *See Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (finding that the ALJ erred by overlooking the fact that a Chiari I malformation supported the claimant's claim of experiencing headaches); *Shauger v. Astrue*, 675 F.3d 690, 697-98 (7th Cir. 2012) (finding that the ALJ failed to build a logical bridge

between the evidence and the credibility finding because he ignored several aspects of the testimony regarding the limiting effects of the claimants's headaches, including the measures taken to treat them and the effect on daily activities); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (finding that the ALJ erred by failing to discuss how the claimant's headaches and blurred vision affected her ability to work). If Plaintiff's work as a bagger at a grocery store caused him to have migraines, leading to vomiting, and requiring him to leave work, the ALJ should have explored the impact of these effects on Plaintiff's ability to sustain work for eight hours a day, five days a week. SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). And, nothing in the credibility determination explains why this aspect of the testimony is not credible. Like in *Moon*, even if the ALJ did not fully credit Plaintiff's testimony overall, the ALJ should have discussed why she did not credit the testimony regarding the effects of Plaintiff's headaches, including the resulting vomiting, and the need to sleep to alleviate them. *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014).

Remand is required for consideration of the effect of Plaintiff's headaches on his ability to perform basic work-related activities, including the ability to routinely complete a work day.

2.    *Walking*

Plaintiff argues that the ALJ erred by not making a specific finding in the RFC as to how long Plaintiff can "walk" during the day. In the physical RFC, the ALJ found that Plaintiff has the "residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can occasionally lift and carry 20 pounds and frequently 10 pounds, *sit for six hours and stand for 6 hours*; is able to occasionally be exposed to extreme cold, extreme heat, wetness, humidity, fumes, odors and pulmonary irritants; . . . ." (AR 15) (emphasis added). Thus, the ALJ found that Plaintiff can perform light work with certain listed exceptions. By definition, light work

requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, at *6; *see also* 20 C.F.R. § 416.967(b) ("[A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."). And, the ALJ gave "great weight" to the state agency medical consultant opinion, who opined, as recited by the ALJ in the decision, that plaintiff "retains the capacity to lift and carry up to 20 pounds occasionally and 10 pounds frequently; *stand and/or walk for six hours* and sit for 6 hours out of an 8 hour day; should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts gases, and poor ventilation." (AR 19) (emphasis added). Notably, Plaintiff does not contest the weight given to this opinion.

The only evidence Plaintiff cites in support of additional limitations on walking is his testimony that he could walk about three to four blocks. (ECF 13, p. 7 (citing AR 41-42)). At the hearing, Plaintiff testified:

> Q      How much can you walk at one time without being in pain?
> A      I can walk a pretty far distance without being in pain.
> Q      So how much would you say that is, like a mile?
> A      Let me think. I can walk like from that speedway over there to maybe here – maybe about here--
> Q      Okay.
> A      – would be okay, but any further than that I would probably – I would most likely be in pain.
> . . .
> A      It's like three – it's like four blocks.

(AR 40-41). Plaintiff's attorney did not elicit any further testimony about difficulty walking.

In contrast, in the decision, the ALJ noted the August 2013 consultative examination in which the doctor noted a normal gait, normal extremities, normal range of motion, and ability to walk on heels and toes without any difficulty despite decreased range of motion in lumbosacral spine. (AR 17). The ALJ also noted that physical examinations by Plaintiff's primary care physician

in 2014 for minor and temporary conditions indicated normal range of motion, normal stability, and normal muscle tone. *Id*. The ALJ noted that an April 2015 visit with Dr. Shepherd, regarding surgery for Plaintiff's scoliosis, indicated that Plaintiff did not have any pain and was active with skateboarding and snow boarding and that Plaintiff ambulated with an abnormal gate without difficulty. (AR 17-18). In the context of the credibility assessment, the ALJ discounted Plaintiff's testimony about his physical limitations on the basis of Plaintiff's participation in outdoor sports and work as a bagger in a grocery store and found that Plaintiff "has remained able to ambulate despite a leaning limp and the progress notes regarding the scoliosis do not support the level of pain alleged." (AR 18).

To argue that perhaps the ALJ intended to include additional walking limits but omitted them, Plaintiff notes that, although the ALJ adopted the state agency medical consultant's opinion, the ALJ nevertheless included additional manipulative and environmental limitations not found by the state agency medical consultant based on evidence the ALJ received at the hearing level. *Id*. Thus, Plaintiff suggests that, since the ALJ found additional manipulative and environmental limitations, perhaps the ALJ found additional walking limitations. This argument is not well taken as the ALJ explicitly articulated the reason for including the additional manipulative and environmental limitations and the ALJ did not express an intent to deviate from the medical opinion as to walking.

A "commonsensical reading" of the decision is that the ALJ did not impose any additional walking limitations. *See Stevenson v. Colvin*, 654 F. App'x 848, 852 (7th Cir. 2016). There was no error in the assessment of Plaintiff's ability to walk in the RFC. However, because the Court is

remapping on the issue of Plaintiff's migraine headaches, the ALJ will have an opportunity to clarify her assessment of Plaintiff's ability to walk.

3.     *Stooping*

On August 5, 2013, Dr. Siddiqui, who examined Plaintiff for a disability medical evaluation, noted on a Range of Motion Chart lumbar forward flexion of 20 degrees (with normal range of motion being 90 degrees). (AR 564). And, an October 17, 2014 progress note from treating physician Dr. Shepherd indicated range of motion of the lumbar spine as 40 degrees in flexion. (AR 608). Plaintiff argues that the ALJ erred by failing to include any limit on stooping in the RFC given this evidence of reduced range of motion in his lumbar spine.

The ALJ gave great weight to the state agency medical consultants Dr. Brill and Dr. Corcoran, who found no postural limitations. *See* (AR 19, 87, 101). Both doctors specifically noted the August 5, 2013 record of decreased range of motion in the cervical and lumbar spine. (AR 88, 102). Both also noted the increase in the curvature of Plaintiff's spine noted on May 3, 2013, and that the February 2013 x-ray noted moderate levoscoliosis of the thoracolumabar spine and pelvic tilt down to the left. Thus, unlike the cases cited by Plaintiff, there was no conflict in this case for the ALJ to resolve between the consultant's opinions and the examination records. *Compare Mueller v. Colvin*, 524 F. App'x 282, 286 (7th Cir. 2013) (finding no conflict when the doctor who opined that the plaintiff could stoop occasionally relied on a different doctor's prior finding of an ability to bend forward only 50 degrees); *with Thomas v. Colvin*, 534 F. App'x 546, 551 (7th Cir. 2013) (finding that the ALJ failed to resolve inconsistencies between the reviewing doctor's opinion that the plaintiff could stoop, kneel, crouch, and crawl occasionally, and the consultative examining doctor's finding that the plaintiff had only 50 degrees of flexion in the lower back and "was unable

to squat" when the reviewing doctor had reviewed the examining doctor's report and also because the plaintiff had received significant treatment for her back in the nineteen months following the consultative examination); *Golembiewski*, 322 F.3d at 917 (remanding, in part, because the ALJ did not discuss an apparent conflict between the state agency physician's opinion that the plaintiff could stoop occasionally and a prior medical finding of 40 degrees of lumbar flexion); *Luckett v. Berryhill*, 2:16-CV-223, 2017 WL 4174252, at *7 (N.D. Ind. Sept. 17, 2017) (finding that it was not apparent whether the reviewing doctors considered the medical records containing the lumbar flexion measurements).

The ALJ did not err in finding no limit on stooping because the ALJ relied on the opinion evidence of record, which in turn acknowledged Dr. Siddiqui's examination finding of limited lumbar flexion. Moreover, even if the ALJ had limited Plaintiff to occasional stooping and crouching based on those examination findings, Plaintiff would still be able to perform the jobs identified by the ALJ at step five. *See* Dictionary of Occupational Titles, 1991 WL 672783 (Jan. 1, 2016) (323.687-014 Cleaner, Housekeeping (occasional stooping and crouching)); 1991 WL 672865 (Jan. 1, 2016) (344.677-014 Usher (occasional stooping and crouching)); 1991 WL 672694 (Jan. 1, 2016) (311.677-010 Cafeteria Attendant (occasional stooping)). Nevertheless, on remand, the ALJ is encouraged to address the opinion evidence's recognition of the clinical findings of limited lumbar flexion.

4.     *Hands*

Plaintiff argues that the ALJ erred in his consideration of limitations related to Plaintiff's hands. Plaintiff notes that he testified that he has spasms or tremors in his hands, that his handwriting is sloppy and hard to read, and that it is difficult sometimes to use a keyboard. (AR 49). Plaintiff's

stepmother testified that Plaintiff's hands are shaky and that he has difficulty with smaller buttons. (AR 58). During a psychological evaluation, Plaintiff's hands shook and his writing was messy, sometimes illegible. (AR 537). Plaintiff's special education teacher indicated that Plaintiff had poor fine motor skills, making his writing difficult to read. (AR 231).

In the decision, even though the state agency physicians did not assign any manipulative limitations, the ALJ nevertheless found that the evidence supported manipulative limitations, (AR 19), and included in the RFC a limitation of no work requiring Plaintiff to write and of only occasional fingering. (AR 15). Plaintiff argues that the ALJ erred by not explaining how she arrived at this limitation based on the evidence of record and that the ALJ did not explain why she did not include handling limitations as well.

First, Plaintiff's poor handwriting is directly accommodated by the limitation of no writing; further explanation in the decision is not required. Second, as to the limitation on fingering but not handling, Plaintiff does not cite any evidence of difficulty handling. As noted by the ALJ in the decision, on physical examination, Plaintiff exhibited full grip strength and intact sensation and was able to pick up and grip a coin in both hands. (AR 17). Thus, the manipulative limitations are supported by the substantial evidence of record identified by the ALJ. Remand is not required on this basis.

*5.     Learning Disability*

The ALJ found that Plaintiff has the severe impairment of a learning disability. First, Plaintiff argues that the ALJ did not engage in the special technique, *see* 20 C.F.R. § 416.920; however, the ALJ utilized the special technique in assessing Plaintiff's mental impairment, finding that Plaintiff had moderate restriction in activities of daily living, mild difficulties in maintaining

social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (AR 14). In doing so, the ALJ gave great weight to the opinion of state agency psychological consultant Dr. Grange, noting that Dr. Grange reviewed the entire record as it existed at the time of his review and that he has particular and detailed knowledge of the applicable disability standards. (AR 14-15). The ALJ further found Dr. Grange's opinion credible and consistent with the mental status examinations throughout the record as well as Plaintiff's reported daily functioning in statements made by Plaintiff and in treatment notes from care providers. (AR 15). Notably, Plaintiff offers no argument that Dr. Grange's opinion is not supported by the evidence of record.

Second, Plaintiff argues that the ALJ failed to include his moderate difficulties in maintaining concentration, persistence, or pace in the hypothetical questions and the RFC determination. In the RFC determination, the ALJ limited Plaintiff to "simple routine repetitive tasks not at a production rate pace." (AR 15). Plaintiff argues that the limit to not working at "production rate pace" does not account for his difficulties in remembering how to perform tasks and needing reminders. Plaintiff testified that he is forgetful and needs reminders and that his mind wanders. (AR 51-52). His stepmother testified that Plaintiff needs reminders to do daily tasks, (AR 56), and his father testified that Plaintiff could not remember a list of tasks. (AR 61). When Plaintiff worked at the grocery store as a bagger, he needed a job coach to help him remember how to do his tasks and he needed others to help him finish tasks. (AR 61-62). Plaintiff's boss complained to Plaintiff's father that Plaintiff was not performing tasks as they should be done. (AR 62). Even with repeat training from his job coach, Plaintiff would still return to doing tasks incorrectly. (AR 62). In the

function report from Plaintiff, written by his mother, Plaintiff reported that he can pay attention from thirty minutes to one hour and that he does not handle stress well. (AR 208, 209).

Plaintiff's high school special education teacher noted that Plaintiff had problems comprehending and following oral instructions and carrying out multiple-step instructions, required supervision to stay on-task, and required time to refresh his memory when returning to activities done previously. The ALJ gave these statements "some weight," (AR 20), but did not explain that these specific statements were not credible or explain why she did not give them full weight.

Plaintiff notes that, during psychological testing in May 2013, Plaintiff had working memory (4th percentile) and processing speed (8th percentile) in the borderline range. (AR 538). Working memory required Plaintiff to concentrate, process, and organize auditory information, producing a result. *Id.* The processing speed assessment reflected Plaintiff's ability to quickly scan, sequence, or discriminate visual information and factored in short-term memory, attention, and visual-motor coordination. *Id.* The evaluators concluded that Plaintiff may benefit from a job coach, extra time to learn new tasks, being shown multiple times how to complete a task, and being given a list when multiple tasks were required. (AR 540-41). The ALJ gave "significant weight" to the findings and opinions, (AR 20), but did not include any restrictions based thereon. Nor did the ALJ explain how the RFC accommodated these limitations.

The Seventh Circuit Court of Appeals has explained that a limitation to "simple, routine, and repetitive tasks" addresses the requirements of "unskilled work," which the "regulations define as work that can be learned by demonstration in less than 30 days." *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015) (citing 20 C.F.R. §§ 404.1568, 404.1520). The limit to unskilled tasks addresses the

time it takes to learn a job but does not address issues of memory and focus. *Id.*; *see also Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014).

The Commissioner argues that the additional imitation of no "production rate pace" accounted for Plaintiff's moderate difficulties. *See Seamon v. Astrue*, 364 F. App'x 243, 248 (7th Cir. 2010) ("[T]he ALJ captured her moderate limitation in concentration, persistence, and pace when he included a restriction of 'no high production goals.'"). The Commissioner acknowledges that the state agency psychologists found Plaintiff to have moderate limitations in detailed instructions, in maintaining attention and concentration for extended periods, in completing a normal workday and workweek without interruptions from psychologically-based symptoms, in performing at a consistent pace without an unreasonable number and length of rest periods, and in responding appropriately to changes in the work setting. (AR 89, 102-03). However, the Commissioner also notes that the psychologists also agreed that Plaintiff could understand, remember, and carry out unskilled tasks without special considerations in many work environments. (AR 90, 103-04). And, both indicated that Plaintiff could attend to tasks for sufficient periods of time to complete those tasks and could manage the stresses associated with unskilled work. (AR 90, 103-04). Thus, the Commissioner argues that the limit to no "production rate work" went beyond the findings of the state agency psychologists.

However, the ALJ did not discuss Plaintiff's tendency to forget instructions and his tendency to need reminders, even for a simple job requiring bagging groceries and retrieving carts from the parking lot, and the ALJ did not discuss the effect of stress on Plaintiff. Nor did the ALJ explain how the limit to no "production rate work" accommodates these limitations. Remand is required for the

ALJ to discuss the specific effects of Plaintiff's learning disability and how they are accommodated by the limitations in the RFC.

In the closing paragraphs of this section, Plaintiff argues that it is unclear whether, in evaluating his social functioning, the ALJ considered Plaintiff's difficulties in communicating based on a speech impediment. (ECF 13, p. 16). Plaintiff notes that he has been diagnosed with velopharyngeal insufficiency. (AR 610). That same record shows that he had several surgeries for the condition. *Id*. And, when Plaintiff was discharged from speech therapy, he had achieved an 80-90% speech accuracy. (AR 440). Plaintiff fails to note that those records are from 2006, when he was nine years old. He does not identify any recent records regarding the accuracy of his speech. There is no indication that the ALJ or his attorney had any difficulty understanding him at the hearing. The ALJ did not err by not discussing any deficiency with Plaintiff's speech in relation to his social functioning.

### C. Credbility Determination

Finally, Plaintiff argues that the ALJ erred in evaluating Plaintiff's subjective symptoms as well as his parent's statements. In making a disability determination, the ALJ must consider a claimant's statements about his symptoms, such as pain, and how the symptoms affect his daily life and ability to work. *See* 20 C.F.R. § 416.929(a). Subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id*. The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;
(5)     Treatment, other than medication, for relief of pain or other symptoms;
(6)     Other measures taken to relieve pain or other symptoms;

(7)     Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. § 416.929(c)(3). "Because the ALJ is in the best position to determine a witness's truthfulness and forthrightness . . . a court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler*, 688 F.3d at 310-11 (quotation marks omitted) (quoting *Skarbek*, 390 F.3d at 504-05); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain [her] credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry*, 580 F.3d at 477); SSR 96-7p, 1996 WL 374186, at *2 (Jul. 2, 1996) ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.").

Plaintiff raises several concerns with the ALJ's assessment of his credibility and that of his parents. Regarding statements about his migraine headaches and his difficulties with concentration, persistence, and pace, the Court has addressed those issues above in the context of the RFC. As for the remainder of the arguments, on remand the ALJ will be guided by Social Security Ruling 16-3p, which issued new guidance regarding the evaluation of a disability claimant's statements about the intensity, persistence, and limiting effects of symptoms. *See* SSR 16-3p, 2016 WL 1237954 (Mar. 28, 2016); *see also* Notices, Social Security Ruling 16-3p, 2017 WL 4790249 (Oct. 25, 2017) (clarifying that SSR 16-3p only applies when the ALJs "make determinations and decisions on or after March 28, 2016" and that Social Security Ruling 96-7p governs cases decided before that date).

**D. Award of Benefits**

Plaintiff asks the Court to reverse and remand for an award of benefits or, in the alternative, for additional proceedings. An award of benefits is appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). Based on the discussion above, remand, not an immediate award of benefits, is appropriate.

**CONCLUSION**

Based on the foregoing, the Court hereby **GRANTS** the relief sought in Plaintiff's Brief in Support of Reversing the Decision of the Commissioner of Social Security [DE 13], **REVERSES** the final decision of the Commissioner of Social Security, and **REMANDS** this matter for further proceedings consistent with this Opinion and Order.

So ORDERED this 6th day of March, 2018.

s/ Paul R. Cherry_____
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT